UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EQUINOX F&B, INC., <br><br>                              Plaintiff, <br><br> -against- <br><br> ROOTS PRESSED JUICES LLC, <br><br>                             Defendant. | 22-cv-681 (AS) <br><br> <u>OPINION AND ORDER</u> |

ARUN SUBRAMANIAN, United States District Judge:

       Plaintiff Equinox F&B, Inc. ("Equinox") sued Defendant Roots Pressed Juices LLC ("Roots") for breach of contract. Roots brought counterclaims for breach of contract, conversion, and negligence. From April 1, 2024, to April 2, 2024, this Court held a bench trial. The Court received direct testimony by affidavit from seven witnesses, who were all cross-examined live. Two additional witnesses testified by deposition.

       "In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The Court sets out its findings and conclusions below. "For the reader's convenience, the Court finds certain additional facts in the Conclusions of Law section as it applies law to facts." *ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, 2024 WL 2125431, at *1 (S.D.N.Y. May 13, 2024). Based on these findings of fact and conclusions of law, the Court finds Roots not liable for breach of contract, and it finds Equinox liable for breach of contract but not liable for negligence or conversion.

## FINDINGS OF FACT

       Equinox Holdings, Inc. owns and operates fitness clubs. Stipulated Facts ¶ i. In 2021, five of these clubs were in Texas, located in Highland Park, Preston Hollow, Plano, Austin, and River Oaks. *Id.* ¶ ii. Equinox is a subsidiary of Equinox Holdings that procures food and beverages at Equinox Holdings' clubs, including by licensing space in the clubs to vendors. *Id.* ¶ iii. Roots is a Dallas-based health-products company founded and owned by Brent Rodgers. *Id.* ¶¶ vi–vii.

       **I.**    **The Master Operating Agreement**

       In February 2019, Equinox and Roots entered into a Master Operating Agreement (MOA). *Id.* ¶ ix. Under the MOA, Roots would manage and operate cafés at the clubs in Highland Park, Preston Hollow, and Plano. *Id.*

             **A.**    <u>Term of MOA</u>

       The MOA defined the term of the agreement as follows: "The term of this agreement (the '***Term***') shall commence on the Effective Date (the '***Commencement Date***') and shall continue in

full force and effect until March 31, 2021 (the '***Expiration Date***'), unless earlier terminated pursuant to the terms of this Agreement." MOA § 3(A), PX-4 (emphasis in original).

The MOA also provided for an extension period by which the MOA "shall automatically be extended for additional Twelve Month Periods expiring on the anniversary of the Expiration Date (the "***Extension Periods***"), unless one of the parties delivers written notice to the other party of its intention not to renew this Agreement." *Id.* (emphasis in original). Upon extension, the MOA provided that "(i) the 'Term' shall be deemed to include the initial term and the Extension Period, and (ii) the 'Expiration Date' shall mean the date on which the Term, as extended, would then expire pursuant to its terms." *Id.* The MOA was automatically extended pursuant to its terms, with a new expiration date of March 31, 2022.

### B.  Monthly Fees

The MOA required Roots to pay Equinox a "Percentage Fee" for each club, defined as 10% of Roots' monthly gross sales over $30,000 for each month of "the Term." § 4(A). The MOA also provided that "Anything to the contrary notwithstanding, if any Roots F&B Venue is subject to a Minimum Fee, and the Percentage Fee is less than such Minimum Fee, [Roots] shall pay the Minimum Fee as set forth in Section 4(B) below." *Id.* The MOA then defined the Minimum Fee for each of the three clubs, ranging from $500 to $2,000 per month. § 4(B).

### C.  Default

The MOA provided a list of Roots' various duties and responsibilities. § 1. The MOA also contained a "default" section, outlining the following ways that Roots could default on the MOA:

- Roots fails to pay the monthly fee within five days of the fee becoming due;

- Roots violates the conditions and covenants outlined in the MOA in a "material manner" and fails to cure within 15 days of Equinox providing written notice (or 90 days if the default is not "reasonably capable of cure" within 15 days);

- Roots fails to pay a fee (other than the monthly fee) within 10 days of Equinox providing written notice of this failure; or

- Roots defaults on "a second or further occasion in the same manner as may have been cured on an earlier occasion" (other than failing to pay the monthly fee) and fails to cure within 3 days of Equinox providing written notice (or 10 days if the default is not "reasonably capable of cure" within 3 days).

§ 5(A). Failure to pay a monthly fee is the only type of MOA violation that constitutes a default without Equinox first providing written notice and a cure period. *Id.*

The MOA similarly provided a list of all of Equinox's duties and responsibilities. § 2. The MOA's default section stated that Equinox could be in default of the MOA if it violated "in any material manner" the "terms, conditions and covenants" outlined in the MOA and failed to cure within 30 days after Roots provided written notice (or longer if the manner of default is not "reasonably capable of cure" within 30 days). § 5(B).

2

In the event of default by either party, "after such notice and opportunity to cure has expired without cure having been perfected," the non-defaulting party had "the right to terminate" the MOA in accordance with the procedure the Court describes below. § 5(A)–(B)

### D. Termination

The MOA's termination provision stated that the MOA "may be terminated" any of the following ways:

- "by a written notice of termination by the non-defaulting party in the event of a default, and where applicable, after notice and the failure to timely cure, by the other party";

- "in any other manner in accordance with the terms" of the MOA;

- "by Equinox at any time during the Term upon not less than thirty (30) days written notice to [Roots] if Equinox determines, in its sole discretion, that the operation of the Roots F&B Venue does not satisfy quality standards consistent with the first-class nature and healthy lifestyle brand of the Equinox Fitness Club"; or

- "by Equinox if Equinox determines, in its sole discretion, at any time during the Term that the continued relationship with Operator creates legal risks or liabilities for Equinox."

§ 6. In the event of termination, Roots had to turn over their space in the clubs "broom clean and in good condition and repair (ordinary wear and tear excepted) and surrender all keys" to Equinox. *Id.* The MOA also provided that "[a]ny and all obligations of either party to the other vesting prior to such date of termination shall in all respects and without limitation survive the termination" of the MOA. *Id.*

The MOA further stated that "[a]nything to the contrary … notwithstanding," if the MOA is terminated due to insolvency by Roots, default by Roots, or Roots vacating or abandoning the clubs prior to the expiration, then title to Roots' equipment would "automatically vest" in Equinox without payment to Roots. § 1(G)(v). This equipment includes any "appliances, fixtures and equipment" paid for by Roots. § 1(G)(ii), (iv).

The MOA further stated that Equinox had "the right, but not the obligation, at the expiration of the initial or extended Term of this Agreement (or the earlier termination hereof), to keep some or all of" Roots' equipment "in its then 'as is' condition, so long as Equinox compensates" Roots for "sixty percent (60%) of the original price [Roots] paid for the Equipment." *Id.* That price would decrease by 20% for each additional twelve-month period the MOA was extended beyond the original term. *Id.*

### E. Modification Letters

Roots later agreed to operate cafés at the Austin and River Oaks clubs. Stipulated Facts ¶ x. The parties executed two modification letters (in August 2019 for Austin and July 2020 for River Oaks) that incorporated "all of the terms and provisions set forth in the" MOA including "the obligation to pay, throughout the Term, the greater of the Percentage Fee . . . and the Minimum Fee." PX-5 at EQX0187; PX-6 at EQX0518. The Austin modification letter would expire on

November 30, 2021, and the River Oaks modification letter would expire on July 31, 2023. PX-5 at EQX0187; PX-6 at EQX0518.

## II. The September 2021 Incident

In March 2020, the five Texas clubs were shut down due to the pandemic. Cano Decl. ¶ 5. Starting in April 2020, Equinox orally agreed to abate Roots' monthly fees for the five clubs, and that abatement continued until at least September 2021, when the parties began their battle royale. Tr. at 93:7–20.[1]

After the Texas clubs reopened, the parties decided to turn the café at Plano into an "honor bar" where club members would take items and pay by themselves using Roots' point-of-sale system. *See* Cano Decl. ¶ 6; Rodgers Decl. ¶¶ 18–21. Equinox claims that club members began complaining that items at the café were expired. *See* Pasion Decl. ¶ 6; Cano Decl. ¶ 7; Patterson Dep. 19:20–20:8. Roots, on the other hand, claims that it started experiencing a significant number of thefts at Plano, including from Equinox staff. *See* Tr. at 121:22–122:10; Rodgers Decl. ¶¶ 25–28.[2] Both Equinox and Roots claimed that they raised their respective grievances with the other party, and nothing was done. Pasion Decl. ¶¶ 6–7; Rodgers Decl. ¶ 28.

These issues came to a head on September 2, 2021. At 3:50 p.m. CDT, Arthur Donowski (one of Equinox's managers) texted Tara Somers (another Equinox manager) and Rodgers a photo of the fridge at Plano and wrote "Grab and go at Plano???? What's up? This looks terrible." PX-11 at EQX0032; *see also* Tr. at 52:18–23. At 3:52 p.m., Rodgers sent an email to Somers and Donowski. PX-12. The email stated that "[a]fter 19 months of losses Roots will be vacating the Texas Equinox locations in 30 days." *Id.* The email further stated that "[w]e currently have no lease agreements with Equinox and our original master agreement requests a 30 day notice. This is fair considering we will continue to lose money over the next 30 days." *Id.* Rodgers stated that he could "ensure all equipment owned by Equinox will be cleaned and left in good working condition." *Id.*

Rodgers then responded to Donowski's text message, saying, "I Just [*sic*] sent a 30 day notice. We are tired of the theft. We will be vacating all locations." PX-11 at EQX0033. Rodgers testified that, at the time, he mistakenly believed the MOA permitted him to terminate the agreement with 30 days' notice. Tr. at 95:14–16. Donowski responded: "Really, this is how you are ending the 'partnership', no call or conversation, after the number of times I have gone to bat

---

[1] According to Somers, she told Rodgers that Roots would be required to resume its monthly fee payments in September 2021, and Rodgers did not object. Somers Decl. ¶ 16. But Rodgers denied that any such conversation occurred. Tr. at 106:17–107:13; 131:4–6. And the only documentation supporting Somers' claim is an *internal* Equinox chart concerning forecasted rent. PX-10 at EQX205. The document does not contain any evidence of communications between or a mutual understanding of the parties.

[2] Equinox objected to paragraphs 25 through 28 of Rodgers's declaration under Federal Rules of Evidence 402 and 403. Those objections are overruled for the reasons stated in Dkt. 89 and stated on the record at the conference on March 18, 2024. In addition, Equinox's hearsay objection is overruled because any out-of-court statement is not being considered for the truth, but rather to help explain tensions in the parties' relationship at the time of the incident.

for you- abated your rent, and you give a 30 day notice, OK, will forward to our legal team." PX-11 at EQX0033.

At 4:33 p.m., Somers emailed the general managers of the Texas clubs. Stipulated Facts ¶ xiii. The email stated that Roots had provided a 30-day termination notice and directed managers to close down cafés and "make sure that no equipment leaves." PX-13. No one from Roots was copied on this email, and Somers did not otherwise inform anyone at Roots of Equinox's decision to immediately close the cafés. Tr. at 122:20–23; *id.* at 127:23–128:1.

After receiving this email, Paul Krieger (the regional vice president of Equinox Holdings) began providing instructions to Equinox employees via text message and email that they should close the Roots cafés and lock Roots out of the Texas locations. *Id.* at 190:3–13. Todd Zamora, then general manager of the River Oaks club, testified that, "shortly" after receiving Somers' email, he "followed the steps that are listed in the email" and "shut down the cafés." Zamora Dep. Tr. at 4:15–6:18; *id.* at 11:16–12:3; *see also id.* at 17:10–16. The River Oaks Roots employees then called Catherine DeLeon (Roots' manager) and Rodgers to say that they had been told to leave the premises. DeLeon Decl. ¶ 6[3]; Tr. at 138:13–23; *id.* at 149:13–18; *id.* at 150:14–19.

At around 5:15 p.m., Monet Muse (the maintenance manager of the River Oaks club) went to Zamora's office to speak with him. PX-14. When she was leaving his office, she saw River Oaks Roots employees packing up perishables. Muse Decl. ¶ 5. At around 6:30 p.m., Muse saw Roots employees trying to remove Roots' café equipment. Stipulated Facts ¶¶ xiv–xv; Tr. at 58:6–12; PX-14. Muse prevented the Roots employees at River Oaks from removing café equipment (although she allowed them to take the perishables) and then locked the equipment in a storage area. Stipulated Facts ¶¶ xiv–xv.

Jocelyn Cano, the general manager of the Preston Hollow club, emailed her staff at 6:52 p.m., stating that "Roots Cafe has given Equinox their termination notice for all the Texas locations," but that Equinox would "keep the Honor Bar going for as long as we can until they pick up their remaining products." PX-18. She instructed her staff to notify her if they saw "Roots employees taking any equipment such as blender, etc." *Id.*

At 7:07 p.m., Zamora texted Krieger, "Roots tried to take the blenders." PX-15. Krieger responded, "I hope you stopped them." *Id.* And Krieger added, "Tell Mo [Muse] when the police arrive that they are a vendor who is paying rent in our space. They are trying to break their lease and according to the lease if they do their equipment becomes ours. They signed it." *Id.*

---

[3] At trial, Equinox objected to this paragraph of DeLeon's declaration as hearsay. That objection is overruled because the Court considers this testimony not for its truth, but for the effect it had on Rodgers and DeLeon. Whether Rodgers and DeLeon thought their employees were being excluded from the café is relevant to why Rodgers and DeLeon collected the equipment from various Roots locations despite Rodgers's saying that Roots would operate for 30 additional days. *See also* Fed. R. Evid. 803(1) ("A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is not excluded by the rule against hearsay); *see also* Tr. at 141:18–142:4 (ruling on the objection).

5

Soon after, at approximately 7:27 p.m., DeLeon—acting at the direction of Rodgers—traveled to the Plano location with a friend. PX-17; Tr. at 97:1–3. DeLeon testified that after speaking with the Roots employees about what was happening at River Oaks, she thought she should secure Roots' items at Plano, since Plano was an honor bar. Tr. at 161:4–8; *id.* at 165:20–166:10. When she got there, she removed perishables from the café, Roots' iPad (used to allow customers to pay), and a microwave. DeLeon Decl. ¶ 11; Tr. at 100:4–10. According to DeLeon, her actions were in response to what she heard from Roots' River Oaks employees and were not planned prior to hearing from them. DeLeon Decl. ¶ 9.[4]

The Plano club informed DeLeon that she was not permitted to remove the equipment and called a security guard. Stipulated Facts ¶¶ xx–xxii. The security guard said he would be calling a police officer. Tr. at 165:6–16. DeLeon claims that she told the Plano employee that she wanted him to call the police because she wanted to make a report and ensure there was documentation of the event. *Id.* The police issued DeLeon a citation for trespassing. Stipulated Facts ¶ xxii; PX-20. Shortly after, Equinox staff at Plano closed the café and secured the café's remaining equipment. Stipulated Facts ¶ xxiii.

At 7:46 p.m., Krieger texted Cano, Frank Carmona, and Jeff Spiconaro (the general managers at Preston Hollow, Austin, and Highland Park respectively) stating that "[t]he Roots team in Houston tried to remove the blenders, Make [*sic*] sure that isn't happening in your club." PX-17 at EQX0511. Pasion replied, "They are currently in Plano attempting to clear out." *Id.* Another manager responded, "Hope Todd hit em with the people's elbow" and included the following GIF:



*Id.* Krieger then said, "If you can and they haven't been in your club, take anything (blenders) of value and place them in a locked office." *Id.* at EQX0512. When asked if that included an espresso machine, Krieger responded "Hell YES!! Lock that thing up!!! It's ON!!! They are trying to stick it to us right now by being in breach of contract and not finishing out their 30 days. Anything they remove we have little to no chance of recouping. We will have no leverage." *Id.* Cano, Carmona,

---

[4] Equinox objected to this paragraph of DeLeon's declaration based on its characterization of Equinox's actions. That objection is not implicated here, as the Court has not adopted DeLeon's characterization.

and Spiconaro each confirmed that they had secured the items. *Id.* at EQX0513–14; Tr. at 203:1–5; Stipulated Facts ¶¶ xvii–xix.

The next morning, on September 3, Rodgers went to Highland Park and saw that the café was closed and that all the equipment had been removed. Tr. at 139:14–25; Stipulated Facts ¶ xxiv. According to Rodgers, he was not aware of the "automatically vest" provision of the MOA at the time so he had no idea why the equipment and perishables were gone. Tr at 95:21–96:1; *id.* at 121:7–12. He decided to take an espresso machine and two blenders. *Id.* at 104:15–17; 139:17–20.[5] He then went to the Preston Hollow location but was prevented from removing any café equipment. Stipulated Facts ¶ xxv. Rodgers called the Dallas Police Department. *Id.* ¶ xxvi.

Later that day, Roots sent Equinox a letter stating that Equinox had defaulted under the MOA by locking Roots' employees out of the five Texas clubs "without giving Roots any notice of default or the ability to cure any alleged default." DX-6 at Roots000050. The letter demanded that Equinox "immediately allow Roots' employees access to its Roots Pressed Juices store locations within each of the Texas Equinox gyms" or "if it is Equinox's intent to terminate the Operating Agreement, you may contact me so we can make arrangements for Roots to pick up and remove all of its equipment." *Id.* The letter stated that it was "Roots' intention, provided it is allowed access by Equinox, to continue to provide first class health food and juice bar café services to Equinox members until the termination of the Operating Agreement." *Id.*

On September 15, Equinox sent Roots a letter in response stating that it "reject[ed]" Roots' claim that Equinox was in default and that it was Roots that was "in material default" under the MOA. DX-7 at Roots000064. Equinox stated that Rodgers' text message (stating that Roots was "vacating all locations") confirmed Roots' intent to abandon the cafés, which was a "material and wrongful default." *Id.* The letter also stated that Roots' behavior was an abandonment of its obligations and entitled Equinox to Roots' equipment under the "automatically vests" provision of the MOA. *Id.* at Roots000065. Finally, Equinox stated that Roots should "consider this letter Equinox's notice of termination of the Master OA pursuant to Section 6(d) which provides for immediate termination." *Id.*

At trial, it became clear that one of the parties' disputes was whether Roots really planned to service the cafés for 30 days after the September 2 notice. Roots says that as of the time of Rodgers' September 2 text and email, it did plan to do so. It only changed course after Equinox took action: Roots employees at River Oaks were told that the café was being shut down without further explanation. So they panicked. And after they communicated this news to Rodgers and DeLeon, Rodgers and DeLeon also panicked. This led to the River Oaks employees, Rodgers, and

---

[5] At trial, Rodgers denied that he personally took the equipment out of the manager's office where it was being stored. Tr. at 103:1–104:17. The Court makes no finding that it was Rodgers who removed the equipment because the dispute is of no consequence. The parties agree that Roots took possession of the equipment from Highland Park, and Equinox did not allege that Rodgers did something else during the incident that might be of relevance (*e.g.*, jimmied a lock to get into the office, ransacked the office once inside, or harassed Equinox staff). Equinox has failed to establish why it is relevant, as a legal matter, whether the equipment was removed by Rodgers or some other Roots employee acting at his direction, and further why it matters that equipment was removed from an office as opposed to the café area.

DeLeon all removing various items from the cafés because, if they were being shown the door, then they should be able to take their belongings.

Equinox, on the other hand, says that the termination notice was a ruse meant to buy Roots time to clear out the cafés. Equinox argues that Roots never intended to continue servicing the cafés and there was a pre-existing plan to remove equipment from Equinox, using the "30-day notice" as cover. According to Equinox, River Oaks employees attempted to remove equipment before anyone from Equinox communicated to anyone from Roots that the café was being shut down.

Based on the evidence admitted at trial, the Court, as finder of fact, finds that the record supports Roots' account of the events. For one thing, the evidence showed that the River Oaks employees did not begin packing up items until after Zamora started shutting down the café and told the employees to leave the premises.[6] DeLeon and Rodgers both testified credibly that they told Roots employees to remove items only after Equinox staff informed the Roots employees that cafés were closed. DeLeon ¶¶ 6–9[7]; Tr. at 139:21–140:4. And while the Court also found Equinox's witnesses credible, none of them testified to the contrary. In fact, Krieger agreed that "until they were locked out of Equinox, Roots was still operating the cafés" and that Roots had "[n]ot physically" vacated or abandoned the locations when Equinox started shutting down the cafés. Tr. at 198:11–13; *id.* at 200:7–201:4. Further, as stated above, both Krieger and Zamora indicated that they promptly implemented Somers' instructions to close the cafés. That instruction was provided at 4:33 p.m. on September 2. PX-13. Kreiger's instructions to Equinox staff to implement this order commenced immediately. Tr. at 190:11–13. The first evidence in the record of Roots' employees attempting to take back equipment came over two hours later at around 6:30 p.m. All of this evidence supports the Court's finding that Equinox started closing the cafés before any Roots staff attempted to remove equipment or perishables.

As evidence that Roots had a secret plan to vacate the cafés, Equinox pointed to Roots' staffing schedule for September 2021. DX-8. Equinox says that there are no Roots employees scheduled to staff an Equinox café after September 5, which it claims is evidence that Roots was never planning to staff those locations. Tr. at 109:10–111:22. But, as both Rodgers and DeLeon testified, the exhibit is a printout of a dynamic schedule that reflects changes made to staffing after Equinox closed the cafés. Tr. at 112:4–24; *id.* at 146:1–147:25; *id.* at 160:1–11.

DeLeon also testified at trial that she likely had a picture of the schedule as it existed prior to September 2 because she typically sent photos of the weekly schedule to Rodgers. Tr. at 163:5–

---

[6] The parties did not produce much evidence on this one way or the other: neither Zamora nor any of the Roots employees testified at trial. Zamora's deposition testimony provides little clarity. And Muse did not testify as to whether her observations were before or after the Roots employees spoke to Zamora. (Muse had not been at the café earlier in the day and never spoke to the Roots employees, so she also would not have known what Zamora said to the Roots employees. Tr. at 60:2–16.)

[7] Equinox objected to paragraphs 8 and 9, citing "the characterization of Equinox excluding Roots employees." Tr. at 143:24–144:1. This objection is overruled. And the hearsay objection as to paragraph 6 is overruled for the reasons stated above. *See* note 3, *supra.*

20. Upon hearing this testimony, Equinox requested an adverse inference, arguing that these documents were never produced in discovery. As discussed at trial, the Court has disregarded DeLeon's testimony that she has documents supporting Roots' position that were not produced in discovery. But the Court will not otherwise disregard DeLeon's testimony that the exhibit reflects a dynamic schedule.

As explained on the record, Equinox requested documents in discovery showing the dates and hours worked by each employee at each Equinox café. Tr. at 175:10–18. The schedule provides this requested information. Equinox did not identify any discovery requests seeking documents showing dates and hours employees were scheduled to work *as of September 2*, or documents showing *changes* in scheduled staffing at Equinox locations made on or before September 2. *Id.* 175:10–176:1. Nor was Equinox's counsel able to identify any deposition testimony from DeLeon or any other witness that provided an inconsistent or misleading account with respect to the September 2021 staffing schedule. It seems that Equinox simply did not realize until trial what the exhibit reflected in Roots' view. An adverse inference is not justified by a party's failure to properly request the documents it needs or to inquire during depositions about documents it intends to rely on at trial. And other than ask for an adverse inference, Equinox submitted no other evidence of any preexisting scheme to vacate the cafés.

## CONCLUSIONS OF LAW

### I. Equinox's breach-of-contract claim

Equinox claims that Rodgers' text message and email were an anticipatory repudiation, which it properly elected to treat as a breach that terminated the MOA. Dkt. 70 ¶¶ 100–104. Equinox claims that it should be awarded damages in the form of the minimum monthly fee through the expiration of the MOA (including the modification letters). Roots says that Rodgers' notice was not an anticipatory repudiation, and even if it was, Roots was entitled to (and did) retract any repudiation the following day. Dkt. 68 ¶¶ 30–34.

Rodgers clearly voiced an intent to breach the MOA, since the MOA did not permit Roots to terminate by providing 30 days' notice. But the Court finds that Equinox was still required to give Roots a chance to cure before terminating the MOA and its failure to do so dooms its claim for breach of contract.

### A. Equinox was not permitted to terminate without providing written notice and an opportunity to cure

"Generally, a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." *Point Prods. A.G. v. Sony Music Ent., Inc.*, 2000 WL 1006236, at *3 (S.D.N.Y. July 20, 2000) (internal quotations omitted); *see also E. Empire Constr. Inc. v. Borough Constr. Grp. LLC*, 200 A.D.3d 1, 5 (1st Dep't 2021) ("Our case law is clear that a party's termination is ineffective where the relevant contract provides for a notice-to-cure and notice is not provided."); *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 518 (2d Cir. 1989) (finding termination ineffective when terminating party failed to comply with contractual cure provision). The MOA required that

9

Equinox provide Roots with written notice of any of Roots' material contractual violations and give Roots at least 15 days to cure the violation. *See* MOA § 5(A). Only "after such notice and opportunity to cure has expired without cure" was Equinox permitted to terminate the MOA. *Id.*

Equinox argues that Roots gave up its right to notice and cure when it repudiated the parties' contract. "New York law permits a party to terminate a contract immediately, without affording the breaching party notice and opportunity to cure" when the "nonperforming party either expressly repudiates the parties' contract or abandons performance thereof." *Needham v. Candie's, Inc.*, 2002 WL 1896892, at *4 (S.D.N.Y. Aug. 16, 2002) (citations omitted), *aff'd*, 65 F. App'x 339 (2d Cir. 2003). In evaluating whether Equinox was relieved of its duty to provide notice and opportunity to cure, "the decisive issue [is] not whether there was a repudiation, but whether there was a repudiation that rendered notice *futile*." *In re Best Payphones, Inc.*, 450 F. App'x 8, 11 (2d Cir. 2011) (describing the "reasoning of" *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720 (2d Cir. 1992)).

Here, based on the trial evidence, the Court finds that Rodgers' text message and email did not "rise to the level of an unequivocal repudiation such that notice would be futile." *Id.* For one thing, the email itself contemplated ongoing performance, not a sudden end. Rodgers not only indicated that Roots would continue performing for 30 days, but also that he expected to continue communicating with Equinox staff in the interim. PX-12. There were even Roots staff members in the middle of their shifts when Rodgers' notice was sent. The parties also had a history of close communication and collaboration: Rodgers and Somers spoke often by phone or email, Rodgers knew many members of Equinox management personally, and (as Equinox repeatedly emphasized throughout trial) the parties had a history of working together to allow Roots to continue operating during much of the pandemic. *See* Tr. at 122:11–23; PX-11. Further, the September 15 letter by Equinox characterized Rodgers' text message and email as a "material and wrongful breach," rather than a repudiation. DX-7 at Roots000064. Finally, "the fact that [Roots] attempted to withdraw its alleged repudiation within the 30 [day] period demonstrates non-futility." *Bausch & Lomb*, 977 F.2d at 728.

Roots retained its rights to notice and an opportunity to cure for a second reason: the MOA states that Roots' refusal to operate is a breach subject to the notice-and-cure provisions. The MOA states that "terminat[ing] or refus[ing] to operate individual Roots F&B Venues … will constitute a default" under the MOA and entitle "Equinox to exercise its default rights under Section 5(A)." MOA § 3(C). So the MOA seems to displace the common-law rule that a repudiation can waive the right to notice and the opportunity to cure. Instead, the parties agreed that Roots' terminating or refusing to operate any café would still be subject to the notice-and-cure requirements of the contract. In response, Equinox argues that this provision only applies to "individual" cafés, and thus does not encompass this situation, where Rodgers refused to operate all the cafés. But Equinox's argument reads too much into the word "individual." "Roots F&B Venues" is defined in the MOA to include all three Equinox cafés that the MOA originally contemplated. § 1. So the word "individual" makes clear that refusal to operate even one such location would be a breach. It does not follow that refusing to operate multiple cafés is a type of conduct not contemplated by

10

§ 3(C). Therefore, even if the trial evidence demonstrated that the repudiation was unequivocal, Equinox was still not permitted to terminate the MOA without providing written notice and an opportunity to cure.

Based on this factual record, the Court finds that Equinox was required to give Roots notice and a chance to cure before terminating the agreement. Because it failed to do so, Equinox's breach-of-contract claim fails. *See Raymond Weil, S.A. v. Theron*, 585 F. Supp. 2d 473, 483–84 (S.D.N.Y. 2008) (granting summary judgment on breach-of-contract claim when plaintiff failed to follow cure period under the contract before asserting breach).

### B.   Even if Roots repudiated the MOA, it timely retracted any repudiation

In the alternative, assuming Roots had repudiated the MOA, Roots timely retracted its repudiation the following day in a letter sent by counsel. DX-6 at Roots000050. "The repudiator may retract his repudiation until the other party has elected to terminate the contract or has materially changed his position in reliance on the repudiation." *Vision Ent. Worldwide, LLC v. Mary Jane Prods., Inc.*, 2014 WL 5369776, at *5 (S.D.N.Y. Oct. 17, 2014) (citation omitted). Generally, if "the repudiation is wholly anticipatory, nullification [of the repudiation] leaves the injured party with no claim at all." Restatement (Second) of Contracts § 256 cmt. a.

Equinox argues that Rodgers' retraction was ineffective because Equinox materially changed its position between receiving the repudiation on September 2, 2021, and receiving the retraction on September 3, 2021. But the trial record does not support this argument. For example, Equinox did not permanently alter the structure of the cafés or hire a different vendor in that time. *See id.* § 256 cmt. c, illus. 3. Nor did Equinox tell Roots that it was canceling the contracts. *Id.* § 256 cmt. c, illus. 4. In addition, Equinox did not send out an official message to club members because the corporate office was closed for a holiday. Tr. at 205:22–206:3; PX-17 at EXQ0516. Managers were instructed to tell Equinox club members that the cafés were just "temporarily closed." PX-17 at EXQ0516. At most, it seems that a handful of Equinox club members might have seen Roots or Equinox employees packing up the cafés or might have been told that Roots was closing. Tr. at 58:19–22; *id.* at 155:16–18. It is also possible that some members noticed that the cafés were empty for a few hours, although there was no evidence at trial introduced to this effect.

When asked to identify a material change, Equinox pointed to the fact that Roots removed items from the cafés. *Id.* at 227:24–228:8. But the Court is not persuaded that this constitutes a material change. For one thing, Equinox did not identify any case law supporting its argument that removing items that could easily be returned constitutes a material change in position. For another, as explained above, Roots employees removed items in response to Equinox's closing down the cafés without telling Roots that it was terminating or providing Roots notice and an opportunity to cure. Equinox is attempting to have its cake and eat it too: avoiding the notice-and-cure provisions it agreed to in the contract by citing repudiation, but also avoiding retraction by citing material changes that were the result of its own failure to provide notice and a chance to cure.

11

There was clearly a breakdown in trust between the parties. But Equinox did not introduce any evidence that any change in position was in reliance on Roots' repudiation of the contract (i.e., the 30-day notice). To the contrary, Equinox's change in position seems to be largely the result of Equinox's own actions—immediately closing down the cafes and "mak[ing] sure no equipment leaves," PX-13—done to maintain (in the words of Krieger) "leverage," PX-17 at EXQ0512. On this record, the Court as factfinder is not persuaded that Equinox's position materially changed based on Roots' repudiation so as to render retraction ineffective.

Equinox also argues that Roots' letter from counsel was not a retraction because Roots did not commit to paying licensing fees in the letter. It is true that Roots' letter contained no explicit commitment on this front. But Roots' letter did not repeat all of Roots' obligations as contained in the MOA. And Equinox has failed to explain why this specific omission would render Roots' retraction void. Equinox's argument is particularly unpersuasive because the alleged repudiation itself did not address refusal to pay any demanded licensing fees, but rather claimed a 30-day termination right that did not exist. The retraction fully addressed the 30-day termination issue and made clear that Roots would abide by the contract.

So even if the Court found that Roots gave up its right to notice and a chance to cure, Equinox's breach-of-contract claim would still fail because Roots retracted any repudiation before Equinox's position materially changed based on that repudiation.

### C. Equinox is not entitled to monthly fees

That doesn't end the inquiry as to whether Roots has any outstanding payment obligations to Equinox. As Roots concedes, Equinox properly terminated the MOA on September 15, 2021. That termination wasn't for breaching the contract, but rather pursuant to § 6(D) of the MOA. DX-7 at Roots000065. This provision allows Equinox to terminate "if Equinox determines, in its sole discretion, at any time during the Term that the continued relationship with [Roots] creates legal risks or liabilities for Equinox." MOA § 6(d).

Equinox claims that this termination was meaningless because the contract had already been repudiated and abandoned by Roots. That's wrong for the reasons discussed above. Absent any proper, prior termination of the MOA, the contract remained in effect until Equinox's September 15 letter.

After Equinox terminated under § 6(d), it was no longer entitled to continue collecting monthly rent. The MOA defined its term as the effective date through to the date of expiration, "unless earlier terminated pursuant to the terms of this Agreement." MOA § 3(A). In other words, the "term" of the MOA was the earlier of proper termination or expiration. When Equinox elected to terminate the MOA, the MOA effectively expired, and the parties' rights and obligations ended. *See Harris v. Reagan*, 221 A.D.3d 1069, 1072 (3d Dep't 2023) ("[A] party's rights and obligations under an agreement typically cease after its termination.").

The payment provision of the MOA also supports reading the rent obligation as only lasting through the "Term." The MOA explicitly states that the Percentage Fee was only due during "the

Term." MOA § 4(A). And the minimum fee was due if "the Percentage Fee is less than [the] Minimum Fee." *Id.* So Roots was obligated to pay the greater of the Minimum Fee or the Percentage Fee through the Term of the MOA. The modification letters make this even clearer, stating that the letters incorporated "all of the terms and provisions set forth in the" MOA including "the obligation to pay, *throughout the Term,* the greater of the Percentage Fee … and the Minimum Fee." PX-5 at EQX0187; PX-6 at EQX0518 (emphasis added). Based on these provisions, the Court finds that under the MOA, monthly fees would be assessed during only the contractually defined "Term," which ends upon termination of the MOA.

Equinox points to the provision in the MOA that states that "[a]ny and all obligations of either party to the other vesting prior to such date of termination shall in all respects and without limitation survive the termination" of the MOA. MOA § 6. But Equinox does not explain how monthly payments for months after the termination "vest[ed] prior" to the termination. In addition, the same section of the MOA states that in the event of termination, Roots would "yield up" the cafés, "broom clean and in good condition and repair (ordinary wear and tear excepted) and surrender all keys … back to Equinox." *Id*. Under Equinox's construction of the MOA, the parties clearly and explicitly outlined Roots' obligation to return the keys, but only vaguely and implicitly mentioned Roots' obligation to pay tens of thousands of dollars in future rent. The Court finds this unpersuasive and holds that expiration of the MOA's Term extinguished Roots' obligations to pay rent for periods beyond that Term.[8]

## II. Roots' counterclaims for breach of contract, conversion, and negligence

Roots brought counterclaims for breach of contract, conversion, and negligence based on Equinox's retention of Roots' equipment and perishables. Roots appears to have abandoned its claims for conversion and negligence: it introduced no evidence regarding these claims at trial and made no mention of them in its proposed findings of fact submitted before trial. *See Purjes v. Plausteiner*, 2017 WL 4350574, at *6 n.4 (S.D.N.Y. June 7, 2017) (concluding theory in complaint was abandoned when plaintiff made "no reference" to it "in his post-trial revised findings of fact and conclusions of law"), *aff'd in part*, 717 F. App'x 98 (2d Cir. 2018); *Munson v. Diamond*, 2017 WL 4863096, at *8 (S.D.N.Y. June 1, 2017), *report and recommendation adopted,* 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017) (same). So the Court finds Equinox not liable on those two claims.

As to Roots' claim for breach of contract, the Court finds that Equinox is liable for improperly retaining Roots' equipment, but not Roots' perishables.

---

[8] In this case, Equinox did not seek any monthly fees during the abatement period, until September 2021. As for whether Equinox is owed a pro rata share of the monthly fee for September, the answer is no. First, Equinox simply didn't make this argument. Equinox didn't contend at trial that if the Court found that Equinox terminated the agreement on September 15, as Roots argued, then Equinox should be awarded pre-termination rent from September 1 through 15. Second, the evidence presented at trial was insufficient for the Court to find that Equinox and Roots had come to any understanding that the agreed abatement of rent would cease in September, or what exactly Equinox communicated to Roots in this regard. *See supra* note 1. Third, even if the abatement had ended, Equinox plainly frustrated Roots' performance of the contract by kicking Roots out on September 2, negating any entitlement to fees for the month of September.

13

A. <u>Equipment</u>

Roots first argues that Equinox was not entitled to retain Roots' equipment. The Court agrees. The MOA states:

> Anything to the contrary set forth in this Section G(v) or elsewhere in this Agreement notwithstanding, if this Agreement shall be terminated due to the insolvency of Operator or due to any default of Operator hereunder, or if Operator shall vacate or abandon the Roots F&B Venue prior to the Expiration Date of this Agreement, title to Operator's Equipment and Operator's Additional Equipment shall automatically vest in Equinox without requiring the payment of any compensation to Operator and Operator confirms that it shall have no further right to any or all of Operator's Equipment or Operator's Additional Equipment.

MOA § 1(G)(v). The MOA further states that Equinox has "the right, but not the obligation, at the expiration of the initial or extended Term of this Agreement (or the earlier termination hereof), to keep some or all of" Roots' equipment "in its then 'as is' condition, so long as Equinox compensates" Roots for "sixty percent (60%) of the original price [Roots] paid for the Equipment." *Id.* That price would decrease by 20% for each additional twelve-month period the MOA was extended beyond the original term. *Id.*

The parties did not argue that the MOA was terminated due to Roots' insolvency. And, even if Roots breached the MOA, Roots did not "default" within the meaning of the MOA because the MOA defines a default as a breach that persists after notice and an opportunity to cure. *See* Tr. at 231:16–18. So the question is whether Roots vacated or abandoned the cafés. The facts at trial make clear that the answer is no.

To be sure, in his September 2 text message, Rodgers stated that Roots would be "vacating all locations." PX-11 at EQX0033. Similarly, in his termination email, Rodgers stated that "Roots will be vacating the Texas Equinox locations in 30 days." PX-12. These messages demonstrate that Roots intended to vacate the cafés at some point before the expiration of the MOA. And at that future point in time, Equinox would have obtained title to the equipment in the cafés, even if Equinox never provided Roots written notice that vacating after 30 days would violate the MOA. Rodgers admitted as much at trial. Tr. at 96:16–20.

But as discussed above, it never got to that point, because Equinox excluded Roots from the cafés. Ample trial evidence supports this finding. For example, Krieger—Equinox Holdings' regional vice president—agreed that "until they were locked out of Equinox, Roots was still operating the cafés." Tr. at 198:11–13. Krieger also admitted that at the point when Equinox decided to shut down the cafés, Roots had "[n]ot physically" vacated or abandoned the locations. *Id.* at 200:7–201:4. The MOA doesn't entitle Equinox to Roots' equipment if Equinox kicks Roots out; the provision Equinox relies on concerns a vendor voluntarily vacating or abandoning their space, leaving Equinox to pick up the pieces. That is not what happened here, and for that reason, ownership of the equipment did not vest with Equinox.

Equinox claims that Roots *did* vacate. According to Equinox, immediately after Rodgers sent his email, Roots employees started packing up Roots' equipment and perishables. But as the Court previously found, none of the witnesses testified that they observed Roots employees removing equipment prior to those employees' learning that Equinox would be shutting down all Roots cafés. And, as discussed above, Equinox's reliance on Roots' staffing schedule does not demonstrate a plan to vacate, because the schedule reflected changes made to staffing once Roots was locked out of the cafés. *See* Tr. at 112:4–24; *id.* at 146:1–147:25; *id.* at 160:1–11. To be clear, neither Roots nor Equinox acquitted themselves properly in this situation, but the evidence at trial shows that the escalating events were the result of a lack of communication between the parties rather than a premeditated plan or attempt by Roots to vacate.

Roots also provided Equinox with notice and an opportunity to cure its breach with respect to the equipment. Roots' September 3 letter specifically requested that Equinox "immediately allow Roots' employees access to its Roots Pressed Juices store locations within each of the Texas Equinox gyms" or "if it is Equinox's intent to terminate the Operating Agreement, you may contact me so we can make arrangements for Roots to pick up and remove all of its equipment." DX-6 at Roots000050. On September 15, Equinox properly terminated the MOA (thereby ending the contractual Term) and noted that it would not return the equipment. DX-7 at Roots000065. Equinox's failure to either return or pay for Roots' equipment constituted an enforceable breach of the MOA.

So the only question that remains is damages. As proof of damages, Roots submitted an exhibit (Defendant's Exhibit 13) that lists the equipment at each Equinox café and the approximate value of that equipment. *See* DX-13. Rodgers stated at trial that he had personally compiled the information at Somers' request. Tr. at 116:18–22. Rodgers relied on information from the internet (particularly for the items on the list that Equinox owned, which are of course not part of Roots' claimed damages) and hard copies of invoices that he had received when the items were purchased. *Id.* at 117:14–118:3.

Prior to trial, Equinox asked the Court to exclude this exhibit because it provided "only the 'estimated' value of the café equipment." Dkt. 73 at 5. At trial, Equinox similarly pointed out that Roots had not produced the actual invoices for the various equipment, other than for an espresso machine. Tr. at 118:10–12. It is true that Roots did not admit into evidence the invoices for all the equipment, which would have been the best evidence of the purchase price. But once it proves that the "fact of damage" is "reasonably certain," Roots need only provide "a stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks omitted). And the Court is persuaded that the testimony of a business owner about the price of his business's equipment provides a stable foundation for estimating the price paid for that equipment.

At trial, Equinox argued that this exhibit should be excluded because it contained improper expert opinions: Rodgers was not disclosed as an expert, and he has no technical or specialized knowledge to testify as to the value of the equipment. Tr. at 88:20–89:5. Equinox also claims that the exhibit contained no explanation for the method used to value each item. *Id.* The Court

disagrees. The testimony of a company's owner based on his personal knowledge of the company's finances is proper lay witness testimony that can be used to calculate damages. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) ("Accordingly, a president of a company, such as Cook, has personal knowledge of his business sufficient to make him eligible under Rule 701 to testify as to how lost profits could be calculated." (cleaned up)). And Roots established that Defendant's Exhibit 13 reflects Rodgers' personal knowledge. Rodgers is the founder and owner of Roots, and he personally compiled the information during his employment (rather than in preparation for trial) based on his knowledge and experience running the business and purchasing equipment for Roots. Tr. at 117:14–121:1; Rodgers Decl. ¶ 59. While Rodgers used the internet to confirm some of the estimates, the Court is not persuaded that this transforms the document into impermissible expert testimony.

Moreover, when "the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (internal quotation marks omitted). Equinox did not introduce any evidence suggesting that the estimated values were inaccurate or that the exhibit was incorrect as to what equipment was at each café. Absent any testimony undermining the accuracy of Rodgers' estimates, the Court also finds that Equinox did not meet its burden of demonstrating uncertainty.

But that doesn't end the story. While Roots requested the full value of the equipment, that isn't an appropriate outcome. In another portion of § 1(G)(v), which addresses a situation where Equinox exercises its right to purchase Roots' equipment, the contract outlines how much Equinox would need to pay: 60% of Roots' original purchase price of the equipment (or 48% for the equipment at Highland Park, Preston Hollow, and Plano, because that equipment was in its second term). Applying these percentages is appropriate to arrive at a reasonable estimate of Roots' damages.[9]

The total estimated value of Roots' equipment (minus the value of the espresso machine and the two blenders that Roots retained) at Highland Park, Preston Hollow, and Plano was $23,000, and the total value of Roots' equipment at Austin and River Oaks was $14,000. So applying the contractual discounts, the Court awards Roots $19,440 in damages for its equipment, plus pre-judgment interest. *See U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991) ("Under New York law, … a [party] who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right.").

### B. Perishable Items

The Court moves next to Roots' breach claim based on Equinox's retention of Roots' perishable items—milk, frozen fruit, nuts, and the like. Here, Equinox agrees that it had no right

---

[9] Where Equinox purchases Roots' equipment, § 1(G)(v) contemplates that the prices would be "verified by original manufacturer or supplier invoices." No such invoices were supplied in this case. But the Court isn't directly applying this part of the parties' contract (it's not at issue because Equinox didn't try to buy Roots' equipment, Equinox just took it.) Rather, the Court looks to the percentages in this portion of § 1(G)(v) because they reflect what a reasonable estimate of Roots' damages are in the case presented and avoid any potential windfall to Roots.

16

to retain the perishable items. Tr. at 236:11–12 (Equinox's counsel stating, "Under the contract, the perishables belong to them. We acknowledge that."). So even if Roots had vacated (which the Court finds that it did not), Equinox was not entitled to possession of the perishables. The record demonstrates that Equinox retained many of the perishables for months. And, according to Rodgers, the goods that were sent back were spoiled and unusable. *Id*. at 115:8–10; Rodgers Decl. ¶ 40. Krieger also testified that some of the products spoiled while they were in Equinox's possession and Equinox threw away those spoiled items without taking an inventory of them. Tr. at 195:2–8. So this should have been an easy claim for Roots to win.

But there was a complete lack of proof here as to both liability and damages. As to liability, it's not clear that Equinox ever laid claim to the perishables or prevented Roots from taking them back. On September 2, Somers instructed Equinox staff to make sure that the *equipment* was not removed once the cafés were closed. PX-13. And Muse allowed the River Oaks employees to gather the perishables before they left. PX-14. Similarly, Krieger instructed managers to make sure that Roots employees were not taking blenders and to "take anything (blenders) of value and place them in a locked office." PX-17 at EQX0511–12. While there is evidence that managers locked up some of the perishables, they were not instructed to do so. *Id.* at EQX0153; PX-21.

There also is no evidence that Roots provided Equinox written notice of Equinox's alleged breach. Roots' September 3 letter did not mention the perishables, stating only that if Equinox intended to terminate the MOA, it should contact Roots' attorney "so we can make arrangements for Roots to pick up and remove all of its *equipment*." DX-6 at Roots000050 (emphasis added).

Moreover, there was a lack of proof as to what happened after September 2 that prevented Roots from repossessing the perishables. Roots did not introduce evidence showing that it asked for the perishables between September 3 and December 7 (when Equinox sent back the unspoiled perishables in its possession). To the contrary, Rodgers testified that "in the days after th[e] incident happened," Equinox told Roots' attorney that Equinox would return the perishables. Tr. at 136:10–14. While Roots' counsel represented that they asked for the perishables to be returned sooner than December, he also admitted that this "wasn't evidence that [Roots] submitted in this case" and that the evidence "was not before the Court." *Id.* at 250:10–15. So Roots failed to meet its burden of proof as to Equinox's liability.

Similarly, as to damages, Roots failed to offer evidence to support its request for $43,000. Roots submitted no admissible evidence showing the value of the perishable goods. Roots relied on two exhibits showing the value of some of its purchases. *See* DX-11; DX-17. But (unlike the exhibit estimating the price of Roots' equipment) those exhibits were not prepared by anyone at Roots and there is no evidence in the record as to who they were prepared by. There is also no evidence that they corresponded at all with the perishables that Equinox retained. Tr. at 112:25–114:16. While the equipment exhibit reflects Rodgers' personal knowledge and relates only to the equipment in the cafés, the exhibits on perishables are not supported by any witness's personal knowledge and do not appear to reflect the perishables specifically retained by Equinox.

The lack of evidence is particularly confusing here because Equinox itself compiled an inventory of all the items that Equinox subsequently returned to Roots (which Roots claims were unusable and needed to be thrown out). *See* DX-22. But Roots offered no evidence or testimony estimating the value of the items on this list. Absent further evidence, the Court would be left to come up with a figure out of thin air. The Court declines to do so.

*   *   *

The contract in this case provided specific instructions on how each party should approach a breach. In almost every instance, the non-breaching party needed to provide notice and an opportunity for the breaching party to cure any deficiency. This case underscores the importance of those contractual provisions: absent communication, an otherwise straightforward dispute led to complete dissolution of the parties' relationship, at least two interventions by law enforcement, and several years of litigation in federal court. All of that may have been avoided with some outreach.

## CONCLUSION

For these reasons, Equinox's request for recovery is denied and Roots' request for recovery is granted in part. The Clerk of Court is directed to enter judgment for Roots on Equinox's claims, for Equinox on Roots' claims for conversion and negligence, and for Roots on Roots' breach-of-contract claim in the amount of $19,440, plus pre-judgment interest pursuant to C.P.L.R. § 5004. The Clerk of Court is further directed to close the case.

SO ORDERED.

Dated: May 17, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge